MULLEN *v.* RUSSWORM *et al.*

(*Nashville,* December Term, 1935.)

Opinion filed February 15, 1936.

WALKER & HOOKER, of Nashville, for plaintiff in error.

TRABUE, HUME & ARMISTEAD, J. G. STEPHENSON and MADDIN & MADDIN, all of Nashville, for defendants in error.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

This damage suit was brought against the owners of a swimming pool by the father and administrator of a young boy who was drowned there. The circuit judge directed a verdict for the defendants. The Court of Appeals reversed the judgment below, holding that the case should have been submitted to the jury. This court granted defendants' petition for *certiorari*.

The swimming pool was located in Cumberland Park on the outskirts of Nashville. An admission fee was charged and bathing suits were rented. The pool was 200 feet long and 80 feet wide. At its western end the water was about 2 feet deep, and the bottom of the pool sloped down so as to make the depth of the water about 15 feet at the eastern end. The basin was constructed of concrete, and there were walks around the sides. There was a raft or float about 20 feet square secured by ropes in the middle of the pool. There were conspicuous figures on the side walls showing each additional foot of the water's depth throughout the length of the pool.

The deceased was a boy 12 years of age. He went out to the pool on the afternoon he was drowned between 2 o'clock and 3 o'clock. He was accompanied by his brother, 15 years of age, and two other boys between 12 and 15 years of age. The boys paid the admission fee and

were each given a locker. The dead boy, Charles Mullen, also rented a bathing suit. The party went into the pool shortly after they arrived.

Charles Mullen could not swim. He was just learning to swim, and could keep afloat a short while, paddling or "swimming dog fashion," as the witnesses say. Charles entered the pool at the shallow part, and was seen playing around that portion of the basin. His older brother, who could swim, and the other boys paid Charles no particular attention, being intent on their own pleasure. One witness saw Charles Mullen, some time after he entered the pool, in water about up to his arm pit. The water on the west side of the float or raft above mentioned seems not to have been over the head of the dead boy. On the east side of the float the water was over his head. One of plaintiff's witnesses saw Charles Mullen on the east side of the float paddling around in water beyond the boy's depth and pulled him up on the raft. The testimony of this witness does not indicate that Charles was in particular difficulty just at this time, but the witness thought the young boy was likely to get into difficulty. After this, Charles was seen on the side or bank of the pool in conversation with some other boys, and this was the last time he was seen alive.

When the older brother and the other boys in the party got ready to go home, they looked for Charles but could not find him. Another one of the Mullen boys, about 18 years of age, had been at the pool that afternoon, and Charles' companions thought he had gone home with his oldest brother or had gone home by himself.

Not coming home for supper, Charles' mother grew alarmed about him, made inquires for him in the neighborhood, and from the police. Later in the night she

learned from the brother who had accompanied Charles to the pool where the boys had spent the afternoon. She thought they had gone to a ball game, and the boy that went to the pool with Charles did not at first tell his mother where they had gone. Contact with the managers of the pool was made during the night, the locker rented by Charles was opened and his street clothes found therein. The pool was then drained, and the body of the boy was found toward the eastern end of the pool where the depth of the water was greatest.

No inquiry was made of Charles or of his companions as to whether any of them could swim when they bought admission to the pool. The dead boy was described as a smart boy, able to read and write, and in the sixth or seventh grade at school. The proof indicates that he was rather undersized.

The boy was drowned on the 4th of July. There was a large crowd present at this bathing pool during the afternoon, between 150 and 200 persons. The owners of the bathing pool employed two lifeguards. One was stationed on either side of the pool during this afternoon in a position to watch the bathers. Charles Mullen was not seen by any witness in the record after he was seen talking to the other boys on the bank of the pool as heretofore stated. An examination of his body when recovered showed that the boy was drowned. There is no proof whatever as to the circumstances attendant upon his death; nothing to indicate when he was drowned. No one saw him in any trouble at any time, except the young man who testified that he pulled the boy out of deep water up on the raft. There is nothing to indicate in what portion of the pool the little fellow was drowned. His body was found in the east end of the pool, but this

was after the pool was drained, and the pool was of course drained from the east or deep end. The current occasioned by draining the pool would naturally have drawn the body to the eastern end wherever it might have been located before.

The negligence alleged on the part of defendants is (1) that the life guards were careless and inattentive to the bathers; (2) that an insufficient number of life guards were employed about the place; and (3) that defendants were negligent in failing to learn whether the boy could swim before admitting him to the pool and permitting him to go into deep water in the pool.

There is no definite proof in the record that the life guards were inattentive or negligent in keeping watch over the bathers. It is only suggested that these life guards were young men and that there were numbers of attractive young women present who might have diverted their attention. This charge of the declaration, therefore, does not require further consideration.

We understand the Court of Appeals to have expressed the opinion that the trial judge should have left it to the jury to say whether the defendants were negligent in failing to provide an adequate number of life guards and should have left it to the jury to say whether defendants were negligent in failing to inquire of the dead boy whether he could swim before admitting him to the pool and permitting him to get into deep water.

One of plaintiff's witnesses does say that it is customary in places of this sort to employ one life guard for every 50 bathers admitted to a swimming pool or to a beach where an admission fee is charged. Here, as previously noted, there were only two life guards, and

the number of bathers in the pool on this afternoon ranged from 150 to 200.

■ We are referred to a number of cases holding that the proprietor of a bathing resort or swimming pool should provide a sufficient number of competent attendants to supervise the bathers and rescue any of the bathers apparently in danger or distress. *Decatur Amusement Park Co.* v. *Porter*, 137 Ill. App., 448; *Levinski* v. *Cooper* (Tex. Civ. App.), 142 S. W., 959; *Brotherton* v. *Manhattan Beach Improvement Co.*, 48 Neb., 563, 67 N. W., 479, 33 L. R. A., 598, 58 Am. St. Rep., 709; *Larkin* v. *Saltair Beach Co.*, 30 Utah, 86, 83 P., 686, 3 L. R. A. (N. S.), 982, 116 Am. St. Rep., 818, 8 Ann. Cas., 977.

Such is doubtless the law. In such of the foregoing cases as liability was adjudged, the bathers were in obvious difficulties before they were drowned. In two of the cases the danger of the bathers was particularly called to the attention of the owners of the establishments before they were drowned, but there were no guards to go to the rescue. In other words, in all these cases, there was a causal connection between the negligence of the proprietors and the death of their patrons.

■ In the case before us, this boy simply disappeared from sight in a pool where more than 150 people were present. None of these people witnessed his disappearance. Nobody saw him in any trouble. Nobody knows where he sank under the water.

Such being the circumstances, it cannot be said that the presence of two or three more guards would have been of any avail. If none of the large number of people near him saw the little boy's danger, it is not likely that

his danger would have been perceived by guards on the side of the pool whether their number was two or four.

Plaintiff's case meets the same obstacle when we come to consider the charge of negligence in failing to ascertain whether the boy could swim before admitting him into the pool and permitting him to get into deep water.

In the first place, it would be rather a strong thing to say that the proprietor of a bathing pool was negligent in permitting a boy to enter the pool until that boy could swim. If such were the rule, the ordinary boy in the cities could never learn to swim.

But beyond this, there is nothing in the record to show that the inability of this young boy to swim brought about his death. He may have been seized with cramp and drowned in shallow water. It is a bare conjecture to say that he was drowned in water over his head. The only thing that could be said to indicate that deceased was drowned in deep water, or that the defendants permitted him to get into deep water, is the circumstance that his body was found at the east end of the pool. For the reasons heretofore stated, this circumstance is without weight. We cannot tell where the body sank.

So we do not find any evidence that the death of this boy proximately resulted from either of the negligent acts or omissions charged against the defendants.

■■ As noted in our cases, in a suit for damages resulting from injuries alleged to have been inflicted by the negligence of the defendant, it is incumbent upon the plaintiff to show three things: First, a breach of duty which defendant owed to him; second, a negligent breach of that duty; and, third, injuries received thereby resulting proximately from that breach of duty. *DeGlopper* v. *Railway & Light Co.*, 123 Tenn., 633, 134 S. W.,

609, 33 L. R. A. (N. S.), 913; *Memphis St. Ry. Co.* v. *Cavell,* 135 Tenn., 462, 187 S. W., 179, Ann. Cas., 1918C, 42.

If it be said that the plaintiff in this case has shown a breach of duty that defendants owed to him or to his child, and a negligent breach of that duty, still we find no definite proof, direct or circumstantial, that defendants' breach of duty proximately caused the injury sustained by plaintiff in the loss of his son.

A case quite similar to this one was *Margaret Maher, Administratrix,* v. *Madison Square Garden Corporation,* 242 N. Y., 506, 152 N. E., 403, 404, finally decided by the New York Court of Appeals. The facts are fully set out in an opinion of one of the justices of the Appellate Division of the Supreme Court when the case passed through that court. 215 App. Div., 653, 212 N. Y. S., 865. The plaintiff's intestate, a boy 14 years of age, was drowned in a swimming pool in New York City. The depth of this pool ranged from 2 feet to 15 feet. The dead boy could not swim, and was last seen paddling in the water about up to his waist. He went into the pool with some companions who left him to watch some high diving at the deep end of the pool. The pool was crowded with people, and there were two life guards on duty. Nobody saw the boy in any trouble before he was drowned. His companions supposed that the deceased had gone home when they left the pool. Late that night his mother caused a search of the pool to be made and the boy was found at the bottom of the deep section. The trial court sent the case to the jury to determine whether the defendant provided a sufficient number of attendants to supervise the bathers and whether it took proper steps to mark the safety limits or to provide for the rescue of

bathers. There was a verdict for the plaintiff, approved by the trial court. The judgment of the court below was affirmed by the Appellate Division, two justices dissenting. The Court of Appeals reversed the Appellate Division and dismissed the suit, saying:

"The evidence establishes that plaintiff's intestate, a boy 14 years of age, was drowned in a swimming pool conducted for profit by the defendant. Though the swimming pool was crowded at the time, apparently no one saw the fatality. We know only that he was playing in the pool one afternoon, and his dead body was found in another part of the pool the next morning and that death was caused by asphyxiation. No inference can be drawn that by act or omission of the defendant or any of its employees the boy was placed in a position of danger which caused his death, or that any greater care by the defendant could have averted accident. The judgments should be reversed and complaint dismissed, with costs in all courts." *Maher, Administratrix,* v. *Madison Square Garden Corp., supra.*

For the reasons stated, the judgment of the Court of Appeals is reversed, that of the circuit court affirmed, and the suit dismissed.